## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 24 2019, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:
CHILD ADVOCATES, INC.

DeDe Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: J.J. (Minor Child),

and

L.J. (Father),

June 24, 2019

Court of Appeals Case No. 18A-JT-3025

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Guardian ad Litem.*

The Honorable Larry Bradley, Magistrate

Trial Court Cause No. 49D09-1805-JT-574

**Tavitas, Judge.**

## Case Summary

L.J. ("Father") appeals the termination of his parental rights to J.J. (the "Child"). We affirm.

## Issues

Father raises two issues, which we revise and restate as follows:

I.   Whether procedural error occurred that violated Father's due process rights.

II.  Whether there was sufficient evidence to terminate Father's parental rights.

## Facts

The Child was born to Mother[1] and Father in August 2016. On May 1, 2017, the Department of Child Services ("DCS") filed a petition alleging the Child is a Child in Need of Services ("CHINS"). The petition alleged: (1) Mother's and Father's inability, refusal or neglect to care for the child; (2) the parents committed an act or failed to act seriously endangering the physical or mental health; and (3) the Child was born with drugs in his system.

As to Father, the petition alleged that, on or about April 27, 2017, Father tested positive for amphetamine, methamphetamine, and THC; however, he denied any drug usage. Father appeared at the detention hearing on May 1, 2017 and requested counsel. Subsequently, Father was incarcerated[2] and waived a fact-finding hearing with regard to the CHINS petition. The trial court granted wardship of the Child to DCS and adjudicated the Child a CHINS on September 15, 2017. Father did not attend the dispositional hearing; nor did Father attend the periodic review hearings on December 5, 2017, March 6, 2018, or the permanency hearing on April 24, 2018. Counsel for Father appeared at each hearing.

---

[1] Mother's parental rights were also terminated; however, Mother is not a party to this appeal.

[2] Father was incarcerated during the entirety of the CHINS and termination proceedings. Initially, Father was incarcerated for a probation violation after he was charged with several new offenses. Father ultimately pleaded guilty in May 2017 to intimidation, a Level 5 felony, and domestic battery, a Class A misdemeanor. Father expects to be released in 2020, at the latest, and is hoping for an earlier release.

[5]    DCS filed a petition to terminate Mother's and Father's parental rights on May 10, 2018. Father did not attend several of the initial or pre-trial hearings; however, counsel for Father did attend the hearings, and Father attended pre-trial hearings on August 29, 2018, and October 1, 2018, by telephone. The trial court conducted separate fact finding hearings with regard to the termination of Mother's and Father's parental rights on October 1, 2018, and November 7, 2018, respectively.[3] Father appeared by phone for his fact finding hearing.[4]

[6]    At the fact finding hearing, K.A. ("Foster Mother") testified that the Child was placed with her in April 2017, when the Child was eight months old. Foster Mother lives with her husband and her eleven-year-old son. Foster Mother testified that she has a great relationship with the Child and that she is willing to adopt the child. Foster Mother testified that the Child has not had any visits with Father while in her care. Father stated that the last time he saw the Child was in May 2017.

[7]    Katrina McGhee is the Child's guardian ad litem ("GAL"). McGhee testified that she was happy with the Child's placement with the foster parents. McGhee also stated that she "never has had a conversation with dad." Tr. p. 56. McGhee does not believe that the Child should be returned to parents

---

[3] Because only Father appeals, the relevant facts are the evidence that was presented at the November 7, 2018, hearing.

[4] Father did file a motion to transport for the termination fact finding, which the trial court denied. The trial court did order, however, that Father's attorney attempt to initiate the ability for Father to video conference in for the hearing.

because "both parents are incarcerated," and accordingly, McGhee "[doesn't] know how they would be able to parent [the Child]." *Id.* McGhee supported DCS's position to terminate parents' rights to the Child and testified that returning the Child to Mother and Father would be detrimental to the Child because the Child has not seen either parent in over a year and neither parent has "participated in any services [for] most of the case." *Id.* at 64. McGhee also noted, however, that Father was not ordered to complete any services during the CHINS proceeding because Father was incarcerated.

[8]    DCS family case manager ("FCM") Reilly Wilson testified that he contacted Father through letters and that Wilson received two letters from Father. Although Father claimed that he was participating in services while incarcerated, Wilson could not verify Father's claim.[5] When asked why the plan changed from reunification to adoption, Wilson stated:

> DCS felt that the parents had adequate time to resolve safety concerns and that [the Child] deserves permanency and those timelines had been past [sic]. He had been in our system for or he had been with DCS as a ward of the State for some time and [Mother and Father] had not alleviated the safety concerns that DCS initially had for [the Child].

---

[5] Father stated he completed the Inside Out Dad's Program and participated in: (1) parenting classes; (2) Healthy Families Program; and (3) the Read to Me Dad Program where Father would record audio of himself reading books.

*Id.* at 74-75. Wilson also stated that Father has not remedied the conditions that kept the Child out of Father's care. Wilson also testified that continuation of the parent-child relationship would pose a threat to the Child's well-being and that Father has not demonstrated he can sustain a safe and stable home for the Child. Wilson requested the trial court terminate the parental rights of Father.

[9] Wilson acknowledged that he does not recall ever speaking with or visiting Father while Father was incarcerated. Father was not involved in the making of the case plan; nor did Wilson ever send Father a case plan. Wilson testified that he never referred Father to the Father Engagement program because it "would have done probably little to help" Father, due to the length of Father's incarceration. *Id.* at 91. Father claims that he expressed his desire to participate in services in a letter to Wilson.

[10] Father testified that his current anticipated release date is May 2020; however, Father has completed the Purposeful Incarceration program and hopes to be released earlier.[6] Father acknowledged that he received documentation from his attorney while he was incarcerated and that his attorney kept Father updated regarding the case proceedings.

---

[6] As a result of Father's incarceration for his probation violation, the trial court recommended the Purposeful Incarceration program in which, after completion of the program, the trial court "will consider modifying placement in 6th year of sentence." Petitioner's Ex. p. 108. Father indicated that, because he completed the program, he hoped to have his sentence modified soon and that he already had an attorney for his sentence modification.

Father and Mother hoped the Child would be reunited with the Child's paternal grandfather or Father's grandmother.[7] Father cannot explain why the Child was not placed with those relatives. At the hearing, DCS noted that it completed a home study with regard to paternal grandfather, but recommended that the Child remain with foster parents.

The trial court terminated Father's parental rights on November 27, 2018. As related to Father, the trial court found:

* * * * *

20. Due to [Father] being incarcerated, no services were ordered by the Court at disposition.

21. Although no documentation was provided, [Father] testified he has completed a therapeutic community living program, two parenting classes while in prison, and participates in alcoholics anonymous and narcotics anonymous.

22. [Father] has been incarcerated during the CHINS case due to violating probation from a 2012 Burglary (a Class B Felony at the time) and Robbery (a Class B Felony at the time) by being charged in May of 2017, of Intimidation using a deadly weapon, Intimidation where threat is to commit a forcible felony, Kidnapping, Criminal Recklessness committed with a deadly weapon, and Domestic Battery.

---

[7] At the beginning of the CHINS proceedings, both Mother and Father also requested that the Child be placed with a maternal cousin. Furthermore, at the permanency hearing on April 24, 2018, the Child's paternal grandfather appeared and requested modification of placement with him.

23. [Father] pleaded guilty to the counts of Intimidation as a Level 5 Felony and Domestic Battery as a Class A misdemeanor on May 7, 2017.

24. [Father] believes his earliest possible release date is in May of 2020. He can request modification of his placement at some future date. He currently has no hearing pending.

25. [Father] has not seen [the Child] since [the] CHINS case was filed. He informed the IDCS family case manager that he had little contact with [the Child] prior to that.

26. [The Child] was not over eight months of age when he last had contact with his father and is now over the age of two.

27. There is a reasonable probability that the continuation of the parent-child relationship between [the Child] and his father poses a threat to [the Child's] well-being in that it would be a barrier to [the Child] being adopted into the home he has known and by the family he knows and is bonded to. Being removed from his home and foster family would be disruptive, and adversely affect his well-being.

28. There is a reasonable probability that the conditions that resulted in the removal and continued placement of [the Child] outside the home will not be remedied by his father. [Father] was incarcerated at the beginning of the CHINS case and will remain so, currently until May of [2020].

29. [The Child] is in a preadoptive home where he has resided since April of 2017. He has been observed as being very bonded in the home.

30. [The Child] does not inquire about his mother or father.

Appellant's App. Vol. II p. 76. Father now appeals.

## Analysis

Father challenges the termination of his parental relationship with the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we neither reweigh the evidence nor judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[15]     Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[8] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[16]     Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section

---

[8] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

   (a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

   (b) If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A)     That one (1) of the following is true:
>
>> (i)      The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii)     The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services of a delinquent child.
>
> (B) that one (1) of the following is true:
>
>> (i)      There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)    that termination is in the best interests of the child; and
>
> (D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

## I.    *Procedural Irregularities*

Father contends that the procedural irregularities during the termination proceedings resulted in a violation of his procedural due process rights. We address each of Father's arguments below.[9]

> The nature of the process due in parental rights termination proceedings turns on a balancing of the 'three distinct factors' specified in *Matthews v. Eldridge,* 424 U.S. 319, 335 [ ] (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing

---

[9] Father argues that DCS failed to "state in the petition whether at least one factor would apply as the basis for filing a motion to dismiss the termination petition." Appellant's Br. p. 23 (footnote omitted). We are uncertain of how this applies to the matter before us, as there does not appear to be any evidence that DCS intended to move forward with a motion to dismiss. Accordingly, Father's argument is waived for failure to make a cogent argument.

governmental interest supporting use of the challenged procedure.

*A.P. v. Porter Cty. Office of Family and Children,* 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000) (citations omitted), *trans denied.* Because of the interlocking CHINS and termination of parental rights statutes, "procedural irregularities in a CHINS proceeding[] may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *Id.* at 1112-13.

[19] DCS argues that Father has waived his argument because he did not object to any of the procedural irregularities below, which Father acknowledges. Waiver notwithstanding, Father invites us to consider his arguments pursuant to the fundamental error doctrine. "The fundamental error doctrine applies to egregious trial errors." *In re B.R.,* 875 N.E.2d 369, 375 (Ind. Ct. App. 2007) (citations omitted), *trans. denied.* "In order for this court to reverse based on fundamental error, the error must have been a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and appear clearly and prospectively." *Id.*

### A. Failure to Notify Father

[20] Father first alleges that DCS "failed to provide Father with notice, in writing, that a petition to terminate his parental rights to [the Child] would have to be filed" once the Child was in DCS's care for at least fifteen of the last twenty-two

months, pursuant to Indiana Code Section 31-34-21-0.2.  Appellant's Br. p. 20.

Indiana Code Section 31-34-21-0.2 provides:

> At a child's first periodic case review occurring after June 30, 1998, the local office is required to advise the child's parent, guardian, or custodian in writing that a petition to terminate the parent-child relationship must be filed with respect to the child after June 30, 1999, if the child has been removed from the child's parent and has been under the supervision of a local office for at least fifteen (15) months of the most recent twenty-two (22) months.  However, if a child's parent, guardian, or custodian fails to appear at the first periodic case review occurring after June 30, 1998, the local office shall make reasonable efforts to send notice of the advisement to the last known address of the parent, guardian, or custodian.

[21] DCS counters that the trial court's dispositional decree indicates that "failure to participate as required by a Parental Participation Order under Ind[iana] Code 31-34-20-3 can lead to the termination of the parent-child relationship under Ind[iana] Code 31-35."  Petitioner's Ex. 7 p. 44.  Moreover, DCS indicates that Father admitted he received information from his attorney and the trial court's orders.[10]

[22] While we agree that the trial court notified Father regarding the potential for termination of his parental rights, the statute clearly indicates that it is DCS's

---

[10] DCS also argues that the trial court found in its April 24, 2018 order that DCS had complied with the notice requirements; however, our review of the trial court's finding indicates that the trial court was referencing DCS's compliance with notification requirements for the periodic case review pursuant to Indiana Code Section 31-34-21-4(a).

responsibility to do so.[11] That said, Father has failed to prove that he suffered clear, substantial harm as a result of DCS's failure. *See B.R.,* 875 N.E.2d at 375. Father was to remain incarcerated until 2020; therefore, even if Father was notified of the time frame for the filing of the termination petition, Father has not shown that he could have been released from incarceration or could have provided a stable home for the Child had he known about the time frame. Accordingly, to the extent that DCS's failure to notify Father was error, Father has not established fundamental error.

## B. Notice of Periodic Case Review

[23] Father claims that he was never notified of the periodic case review hearings and, therefore, was denied the opportunity to be heard. Pursuant to Indiana Code Section 31-34-21-4(a), "[e]xcept as provided in subsection (f), at least seven [] days before the periodic case review, including a case review that is a permanency hearing under section 7 of this chapter, the department shall provide notice of the review" to the persons identified in the statute, including the child's parent, guardian, or custodian, the attorney of record, a prospective adoptive parent, foster parents, or other persons.

[24] Although Father did not attend the periodic case review hearings, Father's attorney attended and represented Father. Moreover, the trial court's order on

---

[11] As noted above, Father also acknowledged that his attorney kept him up to date on the proceedings.

April 24, 2018, indicated that "DCS did provide proof of notice required by subsection (a) at the periodic case review" to Father. Petitioner's Ex. 11 p. 62.

[25] Regardless, Father has not demonstrated that any error created clear and substantial harm. Father had an attorney present at each of the review hearings, and he had an opportunity to be heard through his attorney. This case differs from *A.P.*, 734 N.E.2d at 1117, in which the father had a no contact order with regard to the child and was banned from appearing at the periodic review hearing, despite the father's constant requests to be present. Here, the record does not demonstrate that Father was denied the right to be at the hearing, unlike the father in *A.P.* Father cannot establish fundamental error.

### C. Failure to Involve Father in Case Planning

[26] Father also argues that he was not included in the case planning for the Child; nor was he sent the case plan. Under Indiana Code Section 31-34-15-1, a case plan is required for each child who is under DCS's supervision. Indiana Code Section 31-34-15-2 states that:

> The department, after negotiating with:
>
> (1) the child's parent, guardian, or custodian;
>
> . . .
>
> shall complete a child's case plan not later than sixty (60) days after the date of the child's first placement or the date of a dispositional decree, whichever occurs first.

Once the case plan is completed, a copy "shall be sent, not later than ten [] days after the plan's completion, to: (1) the child's parent, guardian, or custodian; . . ." Ind. Code § 31-34-15-3.

[27] DCS argues that, although this was one of the due process violations identified in *A.P.,* no case plans are included in the record, nor is evidence regarding the contents of the case plan in the record; therefore, DCS urges us to follow *In re T.F.,* 743 N.E.2d 766, 772 (Ind. Ct. App. 2001), *trans. denied.* In *T.F.,* we distinguished *A.P.,* stating:

> [I]n *A.P.,* although no case plans were made part of the court's record prior to the termination hearing, the appellate record contained nine case plans. However, in our case, the record does not contain a case plan, thus the record does not reflect whether a case plan was ever prepared *or* whether the [parents] were ever provided with a copy of a case plan. Therefore, in *A.P.* we had the opportunity to analyze the case plan concurrently with the original dispositional order and the multiple review hearing orders to determine whether the parents were properly notified of their right to know what conduct could lead to the termination of their parental rights. In fact, in *A.P.* we found that the original dispositional order and the multiple review hearing orders provided some written notice to the parents, however, the case plans often contained requirements not contained in the court orders. Therefore, in *A.P.* we held that the difference in requirements between the case plans and the court orders heightened the importance of providing copies of case plans to the parents.

*T.F.,* 743 N.E.2d at 771 (citations omitted). Thus, we concluded that, "because proof of a case plan is not an element enunciated in the termination proceedings

under Ind[iana] Code § 31-35-2-4, the record of the CHINS proceedings is not before this court in order for us to examine whether a case plan was prepared and provided to the [parents]." *Id.* at 772. The same outcome is required here. Accordingly, Father has failed to prove that he suffered clear, substantial harm as a result of DCS's failure to provide Father with the case plans.

### D. Efforts to Reunify

[28] Father also argues that DCS made no efforts to reunify the Child with Father pursuant to Indiana Code Section 31-34-21-5.5(b), which states:

> Except as provided in section 5.6[12] of this chapter, the department shall make reasonable efforts to preserve and reunify families as follows:
>
>> (1) If a child has not been removed from the child's home, to prevent or eliminate the need for removing the child from the child's home.
>
>> (2) If a child has been removed from the child's home, to make it possible for the child to return safely to the child's home as soon as possible.

[29] DCS responds that it "is not required to provide a parent with services directed at reunification with the child while the parent is incarcerated," citing *Rowlett v. Vanderburgh Cty. Office of Family and Children,* 841 N.E.2d 615, 622 (Ind. Ct. App. 2006), *trans. denied.* In *Rowlett,* we noted that DCS "did not, nor was it

---

[12] It does not appear that any provisions of sections 5.6 apply in this case.

required to, provide [the father] with services directed at reuniting him with his children," due to [the father's] incarceration. *Id.* Father has failed to demonstrate fundamental error.

### *E. Failure to Place with Relatives*

[30] Finally, Father argues that DCS failed to identify relatives that the Child could be placed with, despite Mother's and Father's request, initially, that the Child be placed with a maternal cousin and later with paternal grandfather. DCS responds that consideration of placement with relatives is a requirement for a CHINS proceeding; however, Father is appealing a termination proceeding. Indiana Code Section 31-34-4-2 states:

> (a) If a child alleged to be a child in need of services is taken into custody under an order of the court under this chapter and the court orders out-of-home placement, the department is responsible for that placement and care and must consider placing the child with a:
>
>> (1) suitable and willing relative; or
>>
>> (2) de facto custodian;
>
> before considering any other out-of-home placement.
>
> (b) The department shall consider placing a child described in subsection (a) with a relative related by blood, marriage, or adoption before considering any other placement of the child.

[31] We agree with DCS that consideration of relative placement is a concern in a CHINS proceeding. *See In re B.M.,* 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (concluding that, in termination proceedings, DCS is only required to establish that there is a satisfactory plan for the care and treatment of the child) (internal quotations omitted). Accordingly, we find that Father has failed to establish fundamental error.

## II.   *Sufficiency of Evidence*

[32] Father argues that the evidence was insufficient to terminate his parental rights pursuant to Indiana Code Section 31-35-2-4 (b)(2)(B) and Indiana Code Section 31-35-2-4(b)(2)(C). We will address each in turn below.

### A. *Conditions that Led to Removal will not be Remedied*

[33] Father first argues that the trial court erred in concluding the conditions that led to the Child's removal will not be remedied.[13] Specifically Father contends that he "had voluntarily participated in services while he was incarcerated, he was pending an early release due to his participation in services, he had a plan for housing upon his release, and he had a plan for employment upon his release." Appellant's Br. p. 32.

---

[13] Father argues, also, that the trial court erred in concluding that the continuation of the parent-child relationship between Father and the Child poses a threat to the Child's well-being. The statute only requires that DCS prove one of the Indiana Code Section 31-35-2-4(b)(2)(B) factors; therefore, we only address whether the conditions that led to the Child's removal will be remedied.

[34] "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005)). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[35] The trial court found that "[t]here is a reasonable probability that the conditions that resulted in the removal and continued placement of [the Child] outside the home will not be remedied by his father. [Father] was incarcerated at the beginning of the CHINS case and will remain so, currently until May of [2020]." Appellant's App. Vol. II p. 76. The Child was removed for several reasons, including Mother's and Father's inability, refusal or neglect to care for the child, and the parents' acts/omissions that seriously endangered the physical or mental health of the Child. Father has been unable to remedy the situations due to his incarceration.

[36] In *K.E. v. Indiana Dept. of Child Services,* 39 N.E.3d 641, 648 (Ind. 2015), our Supreme Court concluded that, "[a]lthough at the time of the termination hearing Father's possible release was still over two years away[,] that alone is insufficient to demonstrate that the conditions for removal will not be remedied." *Id.* Noting that the "release date alone is not determinative," our Supreme Court considered "whether other evidence, coupled with [the consideration that the father was incarcerated,] demonstrates by clear and convincing evidence a reasonable probability that Father would be unable to remedy the conditions for removal." *Id.*

[37] There, the trial court found that the father had made significant strides because the father had completed twelve programs during incarceration, "the majority of which were completed voluntarily and did not result in sentence reductions." *Id.* Moreover, the child in *K.E.* visited the father every other week for two or three hours, and the FCM in that case "testified that Father interacts well with the [child, and the father's other children] during visitations." *Id.* at 649. The child in *K.E.* also recognized the father, knew who he was, and the father made nightly phone calls to the child.

[38] *K.E.* is distinguishable from the present case. Father has had very little involvement in the Child's life, including prior to his incarceration. Father has not seen the Child since the CHINS case began. While Father has participated in many programs during his incarceration, some of these programs appear to have been completed in contemplation of an early release. Moreover, Father has completed some additional programs for the benefit of his other child, but

not the Child in the present case. In other words, we do not see Father making the same improvement as the father in *K.E.,* and Father's incarceration is not the sole basis for his failure to remedy the conditions that led to removal. Accordingly, sufficient evidence supports the finding that the conditions that led to the Child's removal will not be remedied.

## B. Best Interests of the Child

Father also argues that the trial court erred in concluding that termination is in the best interests of the Child. Father acknowledges that both the GAL and FCM indicated that terminating Father's parental rights was in the Child's best interests; however, Father still contends that was not sufficient because Father participated in services and was bettering himself.

In determining the best interests of a child, the trial court is required to look at the totality of the evidence. *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). The trial court must subordinate the interests of the parents to those of the child involved. *Id.* at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *In re K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*. Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

Father essentially invites us to reweigh the evidence, which we cannot do. *See C.G.,* 954 N.E.2d at 923. Father presented the evidence regarding his attempts at bettering himself to the trial court. DCS presented evidence that Father had not seen the Child in a significant amount of time. While we commend the work Father has done while incarcerated, we will not reweigh the evidence to reach the opposite conclusion as the trial court. The Child is presently in a stable home with foster parents who are willing to adopt the Child. As these proceedings occurred when the Child was at such a young age, the Child does not ask about Mother or Father. We agree that stability of the Child, which presently exists, is a central consideration in these cases. Accordingly, the trial court's conclusion that termination is in the Child's best interests is not clearly erroneous.

## Conclusion

The procedural irregularities in this case do not constitute fundamental error, and accordingly, Father's due process rights were not violated. Sufficient evidence exists to terminate Father's parental relationship with the Child. We affirm.

Affirmed.

Crone, J., and Bradford, J., concur.